# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| ROBYN WEEMS, | : | Case No. 3:17-cv-00204 |
| | : | |
| Plaintiff, | : | Magistrate Judge Sharon L. Ovington |
| | : | (by full consent of the parties) |
| vs. | : | |
| | : | |
| COMMISSIONER OF THE SOCIAL | : | |
| SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

# DECISION AND ENTRY

## I.    Introduction

Plaintiff Robyn Weems brings this case challenging the application of the Social Security Act's Windfall Elimination Provision (WEP), 42 U.S.C. § 415(a)(7), to reduce the amount of her Disability Insurance Benefits. She raises many thoughtful arguments that coalesce into her main thesis that the Social Security Administration's application of the WEP to reduce her Disability Insurance Benefits violated her rights under the Fifth Amendment to the Constitution. The Commissioner finds no error or constitutional violation in the application of the WEP to reduce Plaintiff's Disability Insurance Benefits.

During oral argument, the parties' attorneys skillfully debated their positions.

## II.    Background

In 2014, the Social Security Administration granted Plaintiff's application for Disability Insurance Benefits (DIB) because she was under a "disability" as defined in

the Social Security Act. (Doc. #13, *PageID* #s 882-87). The parties thereafter clashed about how to correctly calculate the amount of Plaintiff's DIB in light of the fact that she was already receiving disability benefits through a state program—namely, Ohio's School Employees Retirement System (SERS).

Plaintiff's membership in SERS centered on the fact that she had worked as a school-bus driver for the Xenia City School system from 1976 to 1993. She points out that Ohio law mandated her to contribute to SERS (Doc. #1, ¶s 8-9), and she therefore had no choice but to become a SERS member. Throughout her employment with Xenia Schools, she contributed of 10% of her earnings to SERS, while Xenia Schools contributed 14% of the same earnings number.

Sometime in or near 1993, Plaintiff injured her lower spine. Her injury prevented her from continuing to work as a school bus driver for Xenia Schools. (Doc. #1, ¶7). She applied for and was granted SERS disability benefits for two main reasons: (1) she had contributed to SERS over many years and had therefore earned vested benefits;[1] and, (2) her spinal injury and resulting inability to work as a bus driver for Xenia Schools meant she was under a "disability" as defined by SERS. Plaintiff began receiving $1,100 per month in SERS disability benefits.[2] (Doc. #13, *PageID* #868).

In 1993, and for almost two decades after, Plaintiff was not eligible to receive DIB

---

[1] Plaintiff explains that her 19 years of work and related SERS contributions easily earned her enough contributory service credits to qualify her for SERS disability benefits. (Doc. #1, *PageID* #s 3-4).

[2] Plaintiff states that in 1993, she stopped working and began receiving SERS benefits. (Doc. #22, *PageID* #1147). An ALJ indicates that Plaintiff began receiving SERS benefits in July 1992. (Doc. #13, *PageID* #868). The difference in dates is insignificant and not at issue in this case.

because her earnings during her Xenia-school days were not covered by the Social Security Act—meaning her earnings as a bus driver were not subject FICA withholdings. The Social Security Administration dubs this "noncovered" employment.

Plaintiff did not work in the years immediately after her school-bus-driving job. Things changed in 2001 when she became a volunteer for Interfaith Hospitality Services. *Id.* at 1053. She ably did this volunteer work—to her credit as a generous and well-intentioned person—because it was far less demanding than her former work as a school-bus driver. In 2002, Plaintiff's volunteer work evolved into full-time employment with Interfaith Hospitality.

Unfortunately, over the years, Plaintiff suffered additional spinal injuries. She concluded in 2012 that she could no longer work, and she applied for DIB. An Administrative Law Judge found that Plaintiff's earnings at Interfaith Hospitality qualified her for insured status under the DIB program. The ALJ also concluded that Plaintiff had been under a disability since July 31, 2012. (Doc. #13, *PageID* #s 882-87). There is no dispute in the present case about the ALJ's conclusions, including that Plaintiff met the DIB program's insured-status criteria and that she was eligible to receive DIB.

Plaintiff met the DIB's insured-status criteria in part because her earnings at Interfaith Hospitality—unlike her previous bus-driver earnings—were subject to FICA withholdings. For every quarter year she worked from 2002 to 2012, she obtained credits toward becoming insured under the DIB program. The Social Security Administration dubs this "covered" employment.

3

Trouble cropped up for Plaintiff at this point due to her history of both covered and noncovered employment. The Social Security Administration issued a Notice of Award to her (without mentioning the WEP), explaining, in part:

> We reduced the amount of your monthly Social Security benefit beginning January 2013. This is the first month that you are entitled to both Social Security and a pension [SERS] based on work which is not covered by Social Security….

*Id*. at 893. The Notice further advised Plaintiff that she would begin to receive monthly benefits in the amount of $241.00. *Id*. at 892, 897.

Correctly realizing that the WEP was at work, Plaintiff responded with a Request for Reconsideration. She argued that the WEP was being unfairly applied to reduce the amount of her DIB. *Id*. at 898-900. The Social Security Administration disagreed. It concluded that the WEP applied because Plaintiff was receiving SERS benefits at the time she became disabled under the Social Security Act. It further found that her DIB had been correctly calculated at $241.00 per month (effective December 2013). *Id*. at 901-10.

Plaintiff next obtained a hearing before Administrate Law Judge Elizabeth A. Motta. After the hearing, ALJ Motta issued a decision. She recognized Plaintiff had received SERS benefits since 1992 in the amount of $1,100.00 per month. *Id*. at 868. ALJ Motta explained that Plaintiff's primary insurance amount of benefits (her DIB) was $479.70 per month, "offset by receipt of her SERS pension …." (Doc. #18, *PageID* #868) (brackets omitted). This reduction left Plaintiff with DIB equaling $241.00 per month (effective December 2013).

4

ALJ Motta also rejected Plaintiff's argument that the difference in disability types and definitions in SERS and the DIB program prevented the WEP from applying to her situation. The different definitions of a "disability" in each program is readily apparent in Plaintiff's situation: She was disabled under SERS because she could no longer perform the job of bus driver for Xenia Schools. She was disabled under the DIB program because there were no jobs that exist in the national economy that she could perform. *Id*. at 868, 887. ALJ Motta found no significance in this difference. She reasoned:

> The type of manner of disability under which [Plaintiff] was awarded two pensions is not relevant to whether the WEP applies…. Counsel puts forth no authority or regulatory provision in support of his WEP argument, which appears to co-exist with the argument that applying the WEP is somehow unfair. The mere dislike or perceived unfairness of a provision does not render it inapplicable.

*Id*. at 869.

ALJ Motta also found no merit in Plaintiff's contention that the WEP is unconstitutional because it deprived Plaintiff of property rights she secured by way of her 12 years of work and FICA contributions during her employment with Interfaith Hospitality. *Id*. ALJ Motta noted that Plaintiff's constitutional challenge "is beyond the scope of this forum…." *Id*. ALJ Motta also noted that the WEP is part of Social Security Law and Policy and has not been declared unconstitutional…." *Id*.

## III.    Standard of Review

Review of ALJ Motta's decision proceeds along two lines: whether she applied the correct legal standards and whether substantial evidence supports her findings. *Blakley v.*

*Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance…." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (citations and internal quotation marks omitted); *see Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014)

## IV.   Discussion

### A.   <u>The WEP and Plaintiff</u>

Plaintiff's predicament begins with the Social Security Act's progressive structure:

> [T]he Social Security benefits formula does not replace 100 percent of a worker's preretirement income, but rather, provides a safety net replacing a percentage of income. Given the decision [by Congress] to only replace a percentage of preretirement income, the system requires a progressive benefit structure—low-income workers receive benefits representing a greater percentage of preretirement income than their high-income counterparts—to provide an adequate standard of living for low-income workers….

Francis Lipman, Alan Smith, *The Social Security Benefits Formula And The Windfall Elimination Provision: An Equitable Approach To Addressing "Windfall" Benefits*, 39 J. Legisl. 181, 185 (2012-2013) (footnotes omitted). This progressive structure works as designed until a worker has engaged in both covered and noncovered employment:

> [A]n employment record that reflects both covered and noncovered employment presents a challenge to equitable application of the Social Security Act. To determine benefits to which a worker is entitled, the Social Security Act first employs an averaging provision that considers 35 years of covered employment. Where an individual's employment record does not reflect 35 years of covered employment, the averaging provision compresses the worker's average earnings. Effectively, a lifetime high-income worker who

6

held both covered and noncovered employment appears to be
a lifetime low-income worker by operation of the averaging
provision. The second step in determining a worker's Social
Security benefits entails application of a progressive benefits
formula to the worker's average earnings. By operation of
the averaging provision and the progressive benefits formula,
a high-income worker who held both covered an noncovered
employment received a higher than statutorily intended
replacement rate (the ratio of benefits to average earnings)
prior to 1983. In an effort to downward-adjust Social
Security benefits for workers who held both covered and
noncovered employment, Congress enacted the WEP in 1983.

*Id*. at 183; *see* 42 U.S.C. § 415(a)(7)(B)(i). More simply, without the WEP, a worker with both

covered and noncovered employment "would be eligible for a 'total retirement pension income

[that would] most likely greatly exceed that of a worker with similar earnings all under social

security.'" *Rudykoff v. Apfel*, 193 F.3d 579, 581 (2nd Cir. 1999) (brackets added) (quoting, in

part, H.R. Rep. No. 25, 98th Cong., 1st Sess. 21-22 (1983) *reprinted in* 1983 U.S.C.C.A.N. 219,

240. This "windfall," as Congress sees it, is the inequity the WEP attempts to eliminate.

Plaintiff has experienced a downward adjustment—and continues to live with it—

due to the application of the WEP to reduce her DIB amount. This hits her hard. Recall

that when the WEP causes a downward adjustment of her initial primary insurance

amount of $479.70 per month, she is left with monthly DIB of $241.00 (effective

December 2013). This is very nearly a 50% reduction in her monthly DIB. Without the

WEP, her monthly DIB would have remained $479.70. *Id*. at 868. The WEP therefore

causes her to lose out on $238.70 per month ($479.70 - $241.00 = $238.70)—although

she doubtlessly did not intend or plan over the years to create or take advantage of any

DIB windfall. [3]

## B.    <u>Plaintiff And The WEP</u>

Plaintiff contends the WEP is broadly worded in a way that fails to account for the differences in disability systems.  She distinguishes the SERS and the DIB system in several ways:

- Each program has its own unique definition of what constitutes a "disability."

- She became disabled in 1993 under SERS because she could no longer work as a school bus driver for Xenia Schools; she became disabled in 2012 under the DIB program because her health problems (more recent injuries) impaired her essentially to the point she could no longer work.

- The differences in the two systems create two distinct events.  Each benefit type she receives arose from her earnings in two different jobs and from her contributions to two different disability-benefit programs during two different time periods—from 1976 to 1993 (SERS) and from much later, 2002 to 2012 (DIB).

Plaintiff emphasizes that she "*is not receiving payment for the same disability twice, nor is she using the same earnings record to receive the payments*…."  *Id.* (Plaintiff's italics).

The distinctions Plaintiff draws between SERS and DIB are accurate.  These distinctions likewise cause a readily understandable unfairness—after all, she paid into each program for years (as initially Ohio law, then later federal law, mandated), and she earned different types of disability benefits without any ill motive and without receiving the full DIB benefits ($479.70 per month) she earned.  Yet, the differences and unfairness do not single out a legal basis by which she can avoid the application of the WEP to her

---

[3] Counsel acknowledged during oral argument that the WEP does not reduce the amount of Plaintiff's SERS benefits.

DIB.  The differences and unfairness do not fit a statutory exception (there are several) to the WEP when a worker, like her, has a history of both covered and noncovered employment.  *See* 42 U.S.C. § 415(a)(7)(A)(ii) (listing exceptions).  She does not cite a case, agency Regulation, or Ruling that creates or applies a WEP exception to circumstances similar to hers.  And her view of the broad wording of the WEP, which does not distinguish between different disability programs (like SERS and DIB), does not expose a legal error in ALJ Motta's application of the WEP to reduce her DIB.

The fact, moreover, that the WEP does not account for differences in disability types merely restates what the WEP is and how it operates.  Yet, Plaintiff asks, "If the claimant is paid for two different reasons by two different entities, what is the logic in claiming that those payments should be offset?"  (Doc. #18, *PageID* #1133).

The logic is found in the WEP's role as a solution to the Social Security Act's windfall problem.  As explained above, the WEP is designed to fix the inequity created by the Social Security Act's progressive structure when it is applied to a worker with a history of covered and noncovered employment.  *Supra*, § IV(A).  Through this fix, "[t]he WEP furthers the rational goal of insuring that certain individuals do not receive an unintended benefit [a windfall] under the Social Security Act because of their particular employment history."  *Rudykoff v. Apfel,* 193 F.3d 579, 581 (2nd Cir. 1999); *see Holmes v. Comm'r of Soc. Sec.*, No. 96-4088, 1997 WL 570398, at *2 (6th Cir. 1997) (citing *Flemming v. Nestor,* 363 U.S. 603, 611 (1960); *Das v. Department of Health and Human Servs.,* 17 F.3d 1250, 1255 (9th Cir. 1994)).  Regardless of whether or not Plaintiff would have actually received such an unintended benefit, the WEP sweeps her into its ambit

because she worked both covered and noncovered jobs.  This calls into question the wisdom and fairness of the WEP: Is it using an inequity to fix an inequity?  Or, asked another way, does it create an inequity by reducing the DIB of some workers who would not otherwise cause another inequity—the windfall problem?

Assuming the answer to both questions is yes as to Plaintiff, her predicament might expose fallibility in the WEP:  It might be overly broad (by overcorrecting the windfall problem) or might disproportionately fall on low-income workers.  And many, in addition to Plaintiff, have astutely criticized the WEP.  *See ibid*, Lipman and Smith at 183 ("the WEP is an extremely controversial component of the Social Security Act that has elicited a variety of criticisms from scholars and opponents.  For example, critics charge that the WEP due to its regressive structure, disproportionately affects low-income workers….").  At best for Plaintiff, however, her contentions probe the shrewdness of the WEP without exposing a legally fatal flaw in its application to her.  "[W]hether legislation meets its objectives is never a basis for striking it down.  Congress is not required to enact perfect legislation."  *Das*, 17 F.3d at 1256 (citing *Dandridge v. Williams,* 397 U.S. 471, 485 (1970)).

Plaintiff relies, in support of her constitutional claim, on the fact that she met the DIB program's insured-status requirement by completing 20 credits in a 40-quarter period.  She asserts that by applying the WEP to reduce her DIB, the Government deprived her of the credits she had acquired for every quarter she worked.  This, according to Plaintiff, constituted a taking in contravention of the Fifth Amendment.

Plaintiff is incorrect.  Under *Flemming v. Nestor*, 363 U.S. 603, 611 (1960), she

does not have a constitutionally protected property interest in the credits she earned and

the insured-status she obtained during her covered employment with Interfaith

Hospitality. "A person covered by the [Social Security] Act has not such a right in

benefit payment as would make every defeasance of 'accrued' interests violative of the

Due Process Clause of the Fifth Amendment." *Flemming*, 363 U.S. at 611. This is in

part because eligibility for DIB does not rest on a worker's FICA contributions but from

the worker's earnings record. *Id*. at 608-09. Consequently, although the Social Security

program was funded in part through her FICA withholdings, those withholdings did not

spark her eligibility for DIB. Instead, it was her time on task—her quarters worked

during her 10 years of covered employment. *See id*. at 609-10 ("[E]ach worker's

benefits, though flowing from the contributions he [or she] made to the national economy

while actively employed, are not dependent on the degree to which he [or she] was called

upon to support the [Social Security] system by taxation…."). In addition, "the Social

Security program was designed to function into the indefinite future…," and its ongoing

viability depends on future economic factors and events—what occurs and when—that

sometimes prove unpredictable. *Id*. at 610. "To engraft upon the Social Security system

a concept of 'accrued property rights' would deprive it of the flexibility and boldness in

adjustment to everchanging conditions which it demands. It was doubtless out of an

awareness of the need for such flexibility that Congress included in the original Act,

and has since retained, a clause expressly reserving to it '(t)he right to alter, amend, or

repeal any provision' of the Act. That provision makes express what is implicit in the

institutional needs of the program." *Id*. at 610-11 (quoting, in part, 42 U.S.C. § 1304).[4] As a result, the Fifth Amendment Takings Clause does not shelter Plaintiff from the WEP's reduction of her DIB. *Id*.; *see U.S. Railroad Retirement Bd. v. Fritz*, 449 U.S. 166, 174 (1980) ("There is no claim here that Congress has taken property in violation of the Fifth Amendment, since railroad benefits, like social security benefits, are not contractual and may be altered or even eliminated at any time." (citing, in part, *Flemming*, 363 U.S. at 608-11)); *see also Mancari v. Berryhill*, 680 F. App'x 469, 470 (7th Cir. 2017) ("a person's expectation that he will receive Social Security benefits is not protected by the Takings Clause; those benefits 'may be altered or even eliminated at any time.'" (citing *Flemming* and *Fritz*)).

Aside from the property issue addressed in *Flemming*, there remained "[t]he interest of a covered employee under the Social Security Act … of sufficient substance to fall within the protection from arbitrary governmental action afforded by the Due Process Clause." *Flemming*, 360 U.S. at 611. The application of the WEP to reduce Plaintiff's benefits has a rational, rather than an arbitrary, basis. *See Parker v. Colvin*, 640 F. App'x 726, 730 (10th Cir. 2016) (the purpose of the WEP is rationally related to a legitimate goal of protecting the fiscal integrity of the social security fund, whether or not is has a greater adverse impact on low-wage workers, and thus, is constitutional); *Kamyk v. Berryhill*, 695 F. App'x 947, 947 (7th Cir. 2017) (noting, "Congress intended to eliminate a 'windfall' in benefits that individuals with untaxed pensions would receive.").

---

[4] The current version of this reservation of right states, "The right to alter, amend, or repeal any provision of this chapter is hereby reserved to the Congress." 42 U.S.C § 1304.

Plaintiff attempts to avoid *Flemming* and the other cases the Commissioner cites (such as *Rudykoff* and *Das*) by arguing that those cases offer unique facts and dicta that are unhelpful to the present issues. She maintains, "The facts of each WEP case are fantastically different. Indeed, the WEP is used to effect so many types of benefits, that any one case may not be authoritative on the issue of constitutionality." (Doc. #25, *PageID* #1172). This does not get Plaintiff far because the reasoning, particularly in *Flemming*, applies equally to the WEP and its application to Plaintiff. The Supreme Court in *Flemming* spoke broadly about the Social Security Act, including its provision of DIB to certain disabled workers. 363 U.S. at 608. The reasoning in *Flemming* therefore applies to the DIB program, especially the Social Security system's need, as previously discussed, for "congressional flexibility and boldness in adjustment to everchanging conditions it demands" as a basis for not engrafting property rights upon it. *Id*. at 610. Congress used this flexibility when enacting the WEP to solve the unpredictable windfall problem that arose over the years before 1983. Because Congress acted rationally, not arbitrarily, in doing so, *Flemming* supports the application of the WEP to reduce Plaintiff's DIB benefits.

It is also insignificant that the WEP reduced Plaintiff's DIB rather than retirement benefits. The WEP plainly applies the calculation of benefits under the DIB program. *See* 42 U.S.C. § 415(a)(1), (7); *see also* 20 C.F.R. § 404.408 (discussing reduction of DIB under the WEP). What is significant under the WEP is that it applies to workers with a history of covered and uncovered employment regardless of whether he or she received disability or retirement benefits. The Commissioner's cases, moreover—notably

*Flemming*, *Rudykoff*, and *Das*—contain WEP-based reasoning that is unrelated to any distinction between DIB and retirement benefits. *See supra*, §IV(A); *see Flemming*, 363 U.S. at 608-11. As a result, the uniqueness Plaintiff finds in her case and the distinctions she draws between her situation and the Commissioner's cases do not help her avoid the application of the WEP to her DIB benefits.

Plaintiff further posits that the WEP is vague as to what events trigger its application. This contention lacks merit. The WEP applies to a definite set of DIB beneficiaries: those who have worked in both covered and noncovered employment. The WEP isolates this set of DIB beneficiaries for treatment (reduction of DIB) that is different than the treatment (no reduction in DIB) of those in the remaining set DIB beneficiaries who worked only covered jobs throughout their years of employment. Such different treatment is a not an arbitrary or irrational solution to the windfall problem discussed above. *Rudykoff,* 193 F.3d at 581; *see Holmes*, 1997 WL 570398, at *2; *Das,* 17 F.3d at 1255. Consequently, the application of the WEP to Plaintiff is not vague and does not violate her rights under the Fifth Amendment.

The fact, moreover, that Plaintiff is not attempting to double dip into the same pool of disability benefits does not cancel out the WEP's application to her. It merely pinpoints a result the WEP causes—the reduction of DIB for Plaintiff, and those like her, who have worked in covered and noncovered employment and who are not double dipping. Pinpointing this result does not reveal a constitutional or other legal basis for relieving Plaintiff of the impact the WEP has on the amount of her DIB. At best, it questions whether the WEP is wise or efficacious solution to the windfall problem.

**IT IS THEREFORE ORDERED THAT**:

1.    ALJ Motta's decision on July 15, 2015 to apply the WEP to reduce the amount of DIB Plaintiff receives is affirmed; and

2.    The case is terminated on the Court's docket.


April 9, 2019                    *s/Sharon L. Ovington*
                                 Sharon L. Ovington
                                 United States Magistrate Judge